UNITED STATES of America, Appellee,

v.

Miguel DIMARZO, a/k/a Michael
DiMarzo, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Mario J. ALZATE–YEPEZ,
Defendant, Appellant.

Nos. 95–1441, 95–1442.

United States Court of Appeals,
First Circuit.

Heard Feb. 9, 1996.

Decided April 10, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied May 13, 1996.

657

David J. Wenc, Windsor, CT, for appellant DiMarzo.

Alan Black, with whom Morton & Black was on brief for appellant Alzate–Yepez.

Andrew Levchuk, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, Boston, MA, was on brief for appellee.

Before TORRUELLA, Chief Judge, CYR and LYNCH, Circuit Judges.

CYR, Circuit Judge.

Appellants Mario Alzate–Yepez ("Mario" or "Alzate") and Miguel DiMarzo were jointly tried and convicted of possessing cocaine, with intent to distribute, see 21 U.S.C. § 841(a)(1) (1994), and conspiracy, see id. § 846. Appellants assign error by the district court in allowing certain trial testimony and denying their respective motions for judgments of acquittal. Appellant Alzate additionally claims that the district court erred in denying his pretrial motion for severance and imposed too harsh a sentence. Finding no error, we affirm.

# I

## BACKGROUND

In April 1994, the Western Massachusetts Narcotics Task Force brokered a cocaine

deal among appellants and one Robert Schultz, an undercover Task Force agent. During the first phase, Alonzo Alzate–Yepez ("Alonzo"), Mario's brother, agreed that he would arrange to deliver five kilograms of cocaine to Schultz at the Westfield Motor Inn on April 12, 1994, in return for $100,000. If all went well on April 12, Alonzo promised to deliver to Schultz another five kilograms a day or two later, and ten kilograms per week thereafter.

On April 12, at approximately 5:00 a.m., appellant Mario and brother Alonzo set out in Mario's car on the 100–mile trip from Boston to Westfield. Upon arrival at the Westfield Motor Inn, Mario remained in the car while Alonzo registered at the Inn. After waiting about fifteen minutes, Mario entered the Inn and requested a separate room overlooking the parking lot. Meanwhile, a Task Force surveillance team had taken up positions around the Inn. Shortly thereafter, the agents saw a male, later identified as Mario, lingering around the office and parking lot of the Inn while carefully observing cars and people in the area.

Agent Schultz and another undercover agent arrived at the restaurant parking lot next to the Inn around 9:30 a.m. Alonzo approached them, introductions ensued, and the three went into the restaurant for coffee. Alonzo told Schultz that he was expecting a courier to arrive with the cocaine at any time. Soon Schultz left the restaurant to "beep" the courier from his car phone, while Alonzo returned to his room at the Inn to await a call from the courier. While Agent Schultz was standing beside his car, he noticed that Mario was observing him and the surrounding area.

A short time later, Schultz went to Alonzo's room on the ground floor, where Alonzo told him that the courier had gotten lost, but now had correct directions to the Inn and should arrive within ten minutes. Alonzo

added that "they" had eight cars, with secret compartments for carrying cocaine, but he was not sure which was being used for this deal. At about 10:45 a.m., a white Oldsmobile entered the parking lot and stopped just outside Alonzo's ground-floor room. Before leaving to meet the driver—as it turned out, appellant Miguel DiMarzo—Alonzo advised Schultz to stay put.

After greeting one another, Alonzo and DiMarzo conversed as DiMarzo scanned the area and the two walked to the restaurant. Shortly after entering the restaurant, Alonzo left, and invited Schultz to join him in the parking lot, where he unlocked the driver's door of the Oldsmobile to let Schultz in the passenger side. After fidgeting with the defroster, Alonzo reached under the dashboard and popped open two interior side panels in the rear seat area which contained several bricks of cocaine wrapped in duct tape and plastic. After inspecting the brick-like packages, Agent Schultz signalled the Task Force surveillance team, and Alonzo, Mario and DiMarzo were arrested. The cocaine recovered from the concealed compartments in the Oldsmobile weighed 4.94 kilograms, almost exactly the five kilograms Alonzo had agreed to supply.

On May 17, 1994, a federal grand jury indicted the Alzate brothers and DiMarzo under 21 U.S.C. §§ 841(a)(1) and 846. Alonzo Alzate pled guilty to both counts, whereas appellants Mario Alzate and Miguel DiMarzo were jointly tried and convicted on both counts. In due course, the district court imposed sentences on appellants and final judgment entered on March 31, 1995. DiMarzo filed a notice of appeal on April 3. Appellant Mario Alzate did not do so until April 13.[1]

## II

### DISCUSSION

#### A. The Severance Motion

Appellant Mario Alzate filed a pretrial motion for a separate trial pursuant to Fed.

---

1. The government contends that we lack jurisdiction of the latter appeal because Mario did not file a notice of appeal within the ten-day period. See Fed.R.App.P. 4(b), 26(a); United States v. Morillo, 8 F.3d 864, 867 (1st Cir.1993). However that may be, this is an appropriate case in which to resolve the appeal on the merits. See United States v. Connell, 6 F.3d 27, 29 n. 3 (1st Cir.1993) (foregoing resolution of jurisdictional question where same party inevitably will prevail on merits).

R.Crim.P. 14, on the ground that the "spill-over" effect of the evidence against DiMarzo would prejudice Mario unfairly. Appellants contended at trial that they had not known that Alonzo Alzate planned to conduct a drug deal at the Inn. Mario argues on appeal that DiMarzo's "mere presence" defense was so patently "ridiculous" that the jury likely concluded—without separately considering the evidence against Mario—that both were guilty. His contention fails.

■■■■ Severance rulings under Fed. R.Crim.P. 14 are reviewed only for manifest abuse of discretion. *United States v. Flores–Rivera,* 56 F.3d 319, 325 (1st Cir.1995).

> As a rule, persons ... indicted together should be tried together[, which] helps ... prevent inconsistent verdicts and ... conserve resources (judicial and prosecutorial). Thus, ... a defendant who seeks a separate trial can ordinarily succeed ... only by making a strong showing of evident prejudice.... Supreme Court precedent instructs that a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

*Id.* (internal citations and quotations omitted). Rarely is severance required in a conspiracy case. *United States v. Brandon,* 17 F.3d 409, 440 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 80, 130 L.Ed.2d 34 (1994). Appellants were charged as coconspirators, and with an identical substantive offense, all in the same indictment. Careful review discloses no unfairness attributable to their joint trial. More particularly, Mario makes no plausible showing of prejudice, especially in light of the *repeated* instruction by the court that the jury must consider the evidence against each defendant independently and return separate verdicts. *Id.* The trial court acted well within its broad discretion in denying the motion to sever.

**2.** We review these discovery and evidentiary rulings under an "abuse of discretion" standard. *United States v. Lanoue,* 71 F.3d 966, 973 (1st Cir.1995) (discovery rulings); *United States v. Neal,* 36 F.3d 1190, 1205 (1st Cir.1994) (continu-

**B.** *The Schultz Testimony*

■ On *redirect* examination Agent Schultz was allowed to testify that, in his experience, innocent observers are not invited to accompany criminals engaged in completing a drug deal. Appellant DiMarzo argues that (1) Fed.R.Crim.P. 16(a)(1)(E) obligated the government to provide him with pretrial discovery relating to Schultz' expert qualifications to testify to this matter, (2) Schultz' opinion was inadmissible under both *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Fed. R.Evid. 704(b) (prohibiting testimony on ultimate jury issue). Similarly, Mario Alzate contends that he was entitled to a mistrial, or at the very least a continuance for further discovery relating to Schultz' expert qualifications.[2] We do not agree.

■ On cross-examination, both defense counsel repeatedly invited Agent Schultz to draw upon his experience as a drug enforcement officer. For example, Schultz was asked whether drug crime participants typically carry weapons. On redirect, the prosecutor asked Schultz: "[C]an you tell us how often in your experience drug dealers bring along with them to a deal a casual innocent observer?" Over defense objections, Schultz was allowed to respond that he had never "seen a person just casually come along for a drug deal."

We reject appellants' contentions that either Criminal Rule 16(a)(1)(E) or *Daubert* was implicated by the challenged testimony. First, the Schultz response expressed neither a lay *nor* an expert *opinion,* as distinguished from a statement of fact as to what Schultz had witnessed during his 29 years in law enforcement. As the challenged testimony proffered *no opinion,* lay or expert, but simply the witness's personal experience relating to a subject bearing directly upon the appropriateness of a jury inference, *see United States v. Batista–Polanco,* 927 F.2d 14, 18 (1st Cir.1991) (extended presence at scene of

ance); *United States v. Pierro,* 32 F.3d 611, 617 (1st Cir.1994) (mistrials), *cert. denied,* —— U.S. ——, 115 S.Ct. 919, 130 L.Ed.2d 799 (1995); *United States v. Cotto–Aponte,* 30 F.3d 4, 6 (1st Cir.1994) (evidentiary rulings).

heroin packaging operation supports "common sense" inference of guilt), long held permissible in such circumstances, *see United States v. Smith*, 680 F.2d 255, 260 (1st Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983), we reject the claim.

Nor did the Schultz testimony encroach upon the jury's factfinding function regarding the ultimate issue of guilt. The district court alertly gave an immediate jury instruction that "mere presence" at a crime scene is insufficient to establish guilt, and that ultimately it was for the jury to decide whether the government had met its burden of proof. *See United States v. Myers*, 972 F.2d 1566, 1577 n. 8 (11th Cir.1992) (Bownes, J.), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1813, 123 L.Ed.2d 445 (1993). When Agent Schultz later was subjected to further cross-examination, *see United States v. Paiva*, 892 F.2d 148, 157 (1st Cir.1989), he conceded the possibility that a driver might not have known that he was transporting someone to a crime scene. Thus, viewing the challenged Schultz testimony in the context of the entire examination, we find neither error nor unfair prejudice.

### C. *Evidence of Prospective Sentence*

■ In an effort to forfend against an argument by the government that DiMarzo had known the cocaine was in the Oldsmobile—based on the improbability that criminal conspirators would entrust such valuable contraband to an innocent third party—DiMarzo sought to inform the jury of the harsh sentence he would face upon conviction, to demonstrate the strong inducement the "real" drug dealers had to select an unsuspecting dupe to transport their drugs, so as to avoid detection themselves. On appeal, DiMarzo contends that the rejection of his proffer denied him the "only way" he had to counteract the adverse inference suggested by the government. We think the district court soundly excluded the evidence. *See Cotto–Aponte*, 30 F.3d at 6 (applying "abuse of discretion" standard to evidentiary rulings). Accordingly, it was proper as well to reject the requested instruction that the jury not draw the inference urged by the government.

The DiMarzo proffer would have necessitated an unwarranted departure from the fundamental division of responsibilities between judge and jury. *See Shannon v. United States*, —— U.S. ——, ——, 114 S.Ct. 2419, 2424, 129 L.Ed.2d 459 (1994). As a general rule, under our criminal justice system it is the jury's responsibility to determine guilt or innocence on the basis of the facts it has found, whereas the court is responsible, among other things, for sentencing a defendant after a guilty verdict. As federal juries perform no sentencing function, "providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* Thus, even assuming that DiMarzo's guideline sentencing range had some minimal probative value—a dubious proposition at best—the district court did not err in rejecting the DiMarzo proffer given the considerations alluded to in *Shannon. See* Fed.R.Evid. 403; *cf. United States v. Luciano–Mosquera*, 63 F.3d 1142, 1153 (1st Cir.1995) (rejecting Sixth Amendment challenge to restriction upon cross-examination relating to potential punishment).

### D. *Sufficiency of the Evidence*

■ Appellants claim reversible error in the denial of their respective motions for judgments of acquittal. *See* Fed.R.Crim.P. 29. Under Criminal Rule 29, we review the evidence in the light most favorable to the government, drawing all plausible inferences and resolving all credibility determinations in line with the verdicts. *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir.1995). We will uphold a verdict if a rational factfinder could have found each essential element of the offense beyond a reasonable doubt. *United States v. Gomez–Pabon*, 911 F.2d 847, 852 (1st Cir.1990), *cert. denied*, 498 U.S. 1074, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991).

■ The government met its test. Under 21 U.S.C. § 841(a)(1), it was required to establish that defendants knowingly and intentionally possessed a controlled substance with intent to distribute. *United States v. Aguilar–Aranceta*, 957 F.2d 18, 23 (1st Cir.), *cert. denied*, 506 U.S. 834, 113 S.Ct. 105, 121 L.Ed.2d 64 (1992). Under 21

U.S.C. § 846, the government was required to establish that defendants agreed, at least tacitly, to commit the substantive offense which constituted the object of their agreement, and that defendants voluntarily participated in the conspiracy. *Flores–Rivera,* 56 F.3d at 323–24. The jury was entitled to rely upon circumstantial evidence—such as presence at the crime scene and association with others involved in the crime—to infer essential elements of the crime, except that such evidence, *standing alone,* is insufficient to support conviction. *Id.* at 324. Although appellants hold themselves out as exceptions that prove the rule, there is ample record evidence, above and beyond their mere presence and association, to permit a rational jury to find guilt under both counts, beyond a reasonable doubt.

■ Appellant Mario Alzate and his brother Alonzo drove approximately 100 miles to the crime scene where Alonzo had made prior arrangements for the cocaine to be delivered to undercover Agent Schultz in return for $100,000. Together with the incriminating circumstantial evidence, the familial relationship between Alonzo (the "pointman") and Mario (the "lookout" and driver) permitted a rational jury inference that Mario well knew he was involved in a drug deal. *See United States v. Morales–Cartagena,* 987 F.2d 849, 851–52 (1st Cir. 1993). There was ample evidence to enable the jury to find that Mario served as the "lookout" at the crime scene, *see United States v. Hernandez,* 995 F.2d 307, 314 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993), especially since the brothers registered in separate rooms at the Inn and Mario requested a room overlooking the parking lot from where he surveilled the crime scene before the drugs arrived. In addition, Mario testified in his own defense, either contradicting the testimony of government witnesses (e.g., in contrast to the Inn manager, denying that he had requested a room overlooking the parking lot) or offering innocent explanations for other suspicious conduct (e.g., that he had strolled around the Inn parking lot just to take in "the countryside"), which the jury was entitled to reject and treat as evidence of consciousness of

guilt. *See United States v. Hadfield,* 918 F.2d 987, 999 (1st Cir.1990), *cert. denied,* 500 U.S. 936, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991).[3]

■ The sufficiency challenge mounted by DiMarzo is without merit as well. The evidence demonstrated that Alonzo had anticipated that the cocaine would arrive in a car equipped with secret compartments, and that he knew how to contact the driver en route. Agent Schultz testified that Alonzo spoke with the driver of the vehicle carrying the cocaine the morning of the drug deal, conceivably via the cellular phone in the white Oldsmobile, and gave him the correct directions to the Inn. A short time later, DiMarzo arrived at the Inn with the cocaine, pulled up just outside the ground-floor room occupied by Alonzo, and immediately met with him. DiMarzo was seen scanning the parking lot as the two men walked to the restaurant. Alonzo returned with the keys to the Oldsmobile and, in the presence of Schultz, opened the concealed interior compartments containing bricks of cocaine in the promised amount.

As we repeatedly have recognized, a jury is free to rely on its common sense, *see, e.g., Hernandez,* 995 F.2d at 314, and may infer that criminal conspirators normally do not involve innocent persons at critical stages of a drug deal, *see, e.g., United States v. Tejeda,* 974 F.2d 210, 213 (1st Cir.1992). Thus, the jury reasonably could infer that DiMarzo knew he was delivering the cocaine needed to consummate the prearranged deal with Alonzo, rather than that Alonzo and appellant Mario Alzate had entrusted to an unsuspecting nonparticipant the responsibility for delivering $100,000 worth of cocaine to the scene of the exchange.

### E. *The Alzate Sentencing Claims*

Mario Alzate claims that he was a "minimal participant," *see* U.S.S.G. § 3B1.2(a) (1995), and that he should have been granted a downward departure based on "aberrant behavior," *see id.* § 5K2.0. Neither contention helps him.

■ First, the district court found that Mario was entitled to a two-level downward adjustment under U.S.S.G. § 3B1.2(b), as a

---

**3.** As there was no abuse of discretion, we likewise affirm the denial of Mario's motion for new

[s] trial under Fed.R.Crim.P. 33. *United States v. Garcia,* 978 F.2d 746, 748 (1st Cir.1992).

"minor participant." On appeal, Mario argues that he deserved a three or four-level adjustment, based on his "minimal role." The record evidence noted above, however, warrants the finding that Mario did not merit a "minimal role" adjustment. *See United States v. Munoz*, 36 F.3d 1229, 1238 (1st Cir.1994) (off-loading portion of single drug shipment or smuggling drugs for small transaction may indicate minimal participation), *cert. denied*, — U.S. ——, 115 S.Ct. 1164, 130 L.Ed.2d 1120 (1995). Thus, there was no clear error. *United States v. Neal*, 36 F.3d 1190, 1211 (1st Cir.1994).

■ Finally, the second assignment of error is squarely foreclosed because the district court was well aware of its authority to grant a downward departure and declined to do so. We therefore lack jurisdiction to review the refusal to depart unless based on a mistake of law. *United States v. Grandmaison*, 77 F.3d 555 (1st Cir.1996) (clarifying "aberrant behavior" standard); *United States v. Lewis*, 40 F.3d 1325, 1345 (1st Cir. 1994). There is no indication that the district court misapprehended the confines of its legal authority.

*Affirmed.*